# WORLD WIDE IMPORTED CAR COMPANY, LTD. ET AL. *v.* THE SAVINGS BANK OF BALTIMORE

[No. 556, September Term, 1978.]

*Decided January 16, 1979.*

The cause was argued before LISS, WILNER and MacDANIEL, JJ.

*Russell D. Karpook,* with whom were *Power & Mosner* on the brief, for appellants.

*Dorothy A. Beatty,* with whom were *Franklin G. Allen* and *Francis B. Burch, Jr.,* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

The Circuit Court for Baltimore County concluded that the claims of World Wide Imported Car Co., Ltd. (appellant) against The Savings Bank of Baltimore (appellee) were barred by the doctrine of *res judicata,* and for that reason it entered summary judgment in favor of the Bank. Was it correct in doing so? Partly, we think.

World Wide, until its fiscal demise, was an automobile dealer; it was owned and operated by one Charles Ziegler. In 1972 and 1973, it entered into two financing agreements with the Bank, each of which led to a lawsuit. The issue before us arises from the relationship between these two agreements, and, thusly, from the relationship between the two lawsuits spawned by them.

The first agreement was a Dealer's Agreement signed on June 9, 1972. This agreement had to do with the purchase by the Bank of notes and other types of deferred payment obligations given to World Wide by customers who bought cars from it. In essence, then, it provided for the financing of World Wide's *sales,* rather than its purchases.

The agreement recites that World Wide desires the Bank to purchase notes, conditional sales contracts, leases, and mortgages evidencing the sale of new and used motor vehicles, such agreements ordinarily being endorsed by World Wide "without recourse". In consideration of the Bank purchasing or otherwise acquiring such agreements, World Wide agreed that the Bank could tender to it for purchase any motor vehicle repossessed by the Bank by reason of any breach of an agreement purchased by the Bank. The tender

would be on an "as is" basis for the balance due on the defaulted agreement; however, if, at the time of delivery, the default existed for 90 days or more, the price to be paid by World Wide would be based upon the National Automobile Dealers Association official used car guide, rather than merely the balance due on the agreement. World Wide retained the right to decline to purchase a tendered vehicle, but if it did so, the Bank could then sell the vehicle at public or private sale, and World Wide was obliged to reimburse the Bank for the difference between what it would have had to pay if it had purchased the vehicle and what the Bank recovered from its own sale.

World Wide agreed that, from the proceeds due it from any transaction, the Bank could retain, for World Wide's account, an amount to be agreed upon. This would constitute a reserve account. With respect to it, the Dealer's Agreement provided, in relevant part:

> "So long as we [World Wide] are not in default hereunder *or under any other obligation to you* [the Bank], you will pay to us on request on or after the first days of January, April and July of each year, the amount of such account in excess on those dates of 10% of the original amounts of the then outstanding agreements heretofore and hereafter purchased or acquired by you. . . . We further agree that you shall have the right to apply the proceeds of this account either in part or in full, or to hold same for the purpose of security, against any liability of ours under this *or any other contract* either actual or contingent, *now existing or hereafter contracted, of any nature whatsoever arising hereunder or otherwise."* (Emphasis supplied.)

Charles Ziegler and his wife Barbara signed a separate agreement on the same day guaranteeing the faithful performance by World Wide of its obligations under the Dealer's Agreement.

The second agreement between the corporate parties was

entitled a Continuing Dealer Floor Plan Agreement, signed on August 1, 1973. This agreement dealt with the financing of World Wide's *acquisitions* rather than its sales. Under this agreement, the Bank was authorized to disburse funds directly to the manufacturer or other seller of vehicles sold to World Wide. Paragraph (c)(1) provided:

> "As security for the payment of all loans now or hereafter made by Bank to Dealer hereunder and all other present or future indebtedness of Dealer to Bank, matured or unmatured, direct or contingent, Bank retains title to each unit of Merchandise for which Bank shall have paid the manufacturer or distributor until Dealer has discharged his obligations to Bank hereunder with respect to such unit, and Dealer grants Bank a continuing security interest in all new and used Merchandise now owned or hereafter possessed by Dealer, whether inventory or equipment, together with Manufacturer's or importer's Certificates of Origin and Certificates of Title or Ownership relating thereto and all proceeds thereof including but not limited to accounts receivable and chattel paper arising from the sale of Merchandise by Dealer not otherwise assigned to Bank."

This agreement also was guaranteed by Charles and Barbara Ziegler.

On August 12, 1975, the Bank sued World Wide and the Zieglers in the Circuit Court for Baltimore County, claiming a breach of the second agreement — the Continuing Dealer Floor Plan Agreement. This action was docketed as No. 91808, and will hereafter be referred to as the "first action." In Count I, the Bank asserted that World Wide had sold motor vehicles subject to the Bank's security interest without making the required payments to the Bank, and that, as a result, the Bank sustained damages of $36,797. In Count II, it was alleged that, as a result of this breach, the Bank was required to repossess and sell those vehicles, and that because of a "shrinkage in value" of the repossessed vehicles, the

Bank suffered an additional loss of $14,246. Accompanying the Declaration was a motion for summary judgment and an affidavit purportedly in support of it.

World Wide, which by then was out of business, never answered either the Declaration or the motion for summary judgment. The Zieglers, however, answered both. Filing a general issue plea to the Declaration, they asserted in their answer to the motion that there was a "controversy of fact for the following reasons:

> a. That the Declaration does not show how the amounts claimed in Counts 1 and 2 are arrived upon. That it does not have a computation attached thereto to show that this is a definite sum due and owing.
>
> b. That there is a reserve for the benefit of World Wide Imported Car Co., Ltd. held by the Savings Bank of Baltimore which contains an amount in excess of the amounts claimed in Counts 1 and 2 and there is no reference in the Declaration to show that this reserve was taken into account in arriving at the amounts claimed."

A similar averment, with respect to this reserve account, was made in an affidavit of Mr. Ziegler that accompanied this answer — that "there were ample funds contained therein to pay all amounts claimed" by the Bank.

Faced with this defense, obviously grounded upon the reserve account created and maintained pursuant to the Dealer's Agreement,[1] the Bank withdrew its motion for summary judgment and substituted another such motion. There was no difference in the motions themselves, but the second motion was supported by an elaborate affidavit explaining in great detail how this reserve account operated and concluding, in the end, that rather than there being ample funds in the account, it actually had a "negative balance."

---

1. There is nothing in the record in either case to show that this "reserve for the benefit of World Wide Imported Car Co., Ltd. held by the Savings Bank" is anything other than the reserve account established under the Dealer's Agreement. Indeed, appellant's counsel conceded at oral argument that he knew of no other reserve account to which this phrase may have referred.

Accompanying and supporting this affidavit were copies of World Wide checks returned for insufficient funds, the Dealer's Agreement, documents used in connection with that agreement, and ledger accounts showing running balances in the reserve account (the last such balance being minus $2,381.81).

On January 27, 1976, the court granted the Bank's motion for summary judgment. Judgment became final in the principal amount of $49,777.46 on February 2, 1976; no appeal was taken.

On September 30, 1977, World Wide and Ziegler filed this action. Count I, on behalf of World Wide, alleged four common counts and a special count claiming that "the Defendant agreed to purchase from the Plaintiff 'notes and/or contracts of conditional sale and/or leases and/or mortgages ..., evidencing the sale of new and used motor vehicles '" and that the Bank breached that agreement by,

> "refusing to purchase said notes and/or contracts of conditional sale and/or leases and/or mortgages from Plaintiff, *and* by failing and refusing to pay sums due Plaintiff from Defendant under the provisions of said 'Dealer's Agreement'". (Emphasis supplied.)

As a result of these breaches, World Wide asserted that its business suffered irreparable injury resulting in its inability to continue to operate its automobile dealership.

In Count II, Ziegler, asserting that he was the president and sole stockholder of World Wide, claimed that as a result of the Bank's breach of the Dealer's Agreement, as alleged in Count I, he lost his employment with World Wide and also suffered other and sundry forms of injury.

The Bank, with ultimate success in the lower court, moved for summary judgment on Count I based upon *res judicata* and interposed a preliminary objection under Maryland Rule 323 to Count II upon the basis that Ziegler lacked legal capacity to sue. Ziegler has not appealed from the adverse judgment against him on Count II, so all that is before us, as noted earlier, is the judgment on Count I.

The essence of appellant's argument on appeal is that the two agreements were separate and distinct from each other, dealing with entirely different matters. Thus, it contends, the first action, involving only the Continuing Dealer Floor Plan Agreement, was not the "same cause of action", did not settle any questions pertaining to the Dealer's Agreement, and therefore would not bar the second suit. The court concluded, however, that the issue of monies allegedly due under the Dealer's Agreement was a defense in the nature of a set-off to the Bank's action for monies due under the Continuing Dealer's Floor Plan Agreement, and that:

> "[w]hen judgment was rendered for the Plaintiff Savings Bank against the Defendant Ziegler for the breach of the 'Continuing Floor Plan Agreement' without any allowance for set-off on the basis of the defense of monies due under the Dealer's Agreement, that defense was adjudicated and obviously denied by the Court."

We had occasion recently to discuss the allied doctrines of direct estoppel (*res judicata*), collateral estoppel, and collateral attack in *Klein v. Whitehead*, 40 Md. App. 1 (1978), *cert. den.*, 283 Md. 734. *See also Singer v. Steven Kokes, Inc.*, 39 Md. App. 180 (1978). The doctrine of collateral attack is clearly not involved here. The question is whether, and to what extent, this second action is barred by either direct or collateral estoppel.

As we pointed out in *Klein*, in order for either of these to apply, the second action must be between the same parties or those in privity with them. World Wide concedes in its brief that this "initial threshold" has been crossed. For direct estoppel to apply, the two causes of action also must be the same; if that is shown, the judgment in the first action is conclusive "not only as to every matter which was offered and received to sustain or defeat the [initial] claim or demand, but as to any other admissible matter *which might have been offered for that purpose.*" (Emphasis supplied.) *LeBrun v. Marcey*, 199 Md. 223 (1952), quoted in *Klein* at p. 13. If the two actions are *not* the same, collateral estoppel may be

applicable, but that would pertain "only with respect to issues of fact actually determined in the earlier proceeding." *Klein,* at p. 15.

We start by looking at the instant action: what is appellant complaining about; what cause or causes of action has it stated? [2] Putting aside the four common counts lumped into Count I, which neither appellee nor the circuit court has addressed, we turn to the "special" count, also included in Count I as paragraph 5 thereof. In this paragraph, appellant alleges the Dealer's Agreement, and claims that "by said 'Dealer's Agreement' the Defendant agreed to purchase from the plaintiff 'notes and/or contracts of conditional sale and/or leases and/or mortgages . . . , evidencing the sale of new and used motor vehicles' by Plaintiff". It claims then that the Bank breached that agreement "by refusing to purchase said notes . . . , *and* by failing and refusing to pay sums due Plaintiff from Defendant under the provisions of said 'Dealer's Agreement' " (emphasis supplied) and that appellant's losses arose from "said action."

A careful reading of this paragraph thus indicates that two rather distinct complaints are included in it — first, that the Bank breached the agreement by refusing to purchase notes that it had agreed to purchase, and second, that it failed to pay appellant sums due under the agreement.

We look now to the first action, and consider (1) to what extent, if any, was it the "same" as the second thus making direct estoppel applicable, and (2) to what extent, if any, were issues of fact raised in the second action actually determined in the first, thus making collateral estoppel applicable?

Appellant addresses only the first question, and argues that the two actions are not the same because they arose out of and dealt with "separate and distinct *independant* [sic] *transactions.*" (Brief, p. 13.) This is too simplistic. When, in

---

2. With respect to its motion for summary judgment, appellee has defended against Count I of the Declaration solely on the basis that it is barred by the earlier judgment; and that is the only issue that the lower court considered (as to Count I) or that we will consider. We express no opinion as to whether any other pleading or substantive defenses might have been available to appellee.

the first action, Ziegler attempted to defeat the Bank's claim by contending, as a set-off, that monies were due to World Wide under the reserve account, that question became very much a part of the first action. Upon reception of the Bank's extensive reply to Ziegler's contentions, the factual correctness of which was not disputed by either World Wide or Ziegler, the court necessarily had to conclude, in rendering judgment in favor of the Bank, that, *as a matter of fact,* no monies were due to World Wide by virtue of the reserve account. Whether, as to *that* claim, we conclude that the actions were the "same" is therefore immaterial. Even if the actions were not the same, that claim asserted by appellant would nevertheless be barred by collateral estoppel, as it involves and indeed is founded upon "issues of fact actually determined in the earlier proceeding."

This is not necessarily true, however, with respect to appellant's contention that the Bank breached the agreement by refusing to purchase notes that it had agreed to purchase. This allegation has nothing to do with the reserve account, which emanated from notes and other obligations that the Bank *had* purchased. There is no indication from any of the pleadings or docket entries in the first action that this claim, or any facts necessary to its resolution, were ever raised by the parties or considered by the court in that action. That fact would preclude the application of collateral estoppel with respect to this claim. Left open, however, is whether the claim may yet be barred by direct estoppel upon the premise that the two actions are the same; and this requires, initially, that we consider, in the context of this second contention, that which was unnecessary for us to consider with respect to the first — whether the causes of action are the same.

The criterion by which this is to be judged is whether the same evidentiary facts would sustain both actions. *MPC, Inc. v. Kenny,* 279 Md. 29 (1977). In *Klein,* quoting from 2 Freeman on Judgments, § 687, we noted, at p. 18:

" 'The cause of action is the same when the evidence will support both actions; or, rather the judgment in the former action will be a bar, provided the evidence

necessary to sustain the judgment for the plaintiff in the present action would have authorized a judgment for him in the former.' If this identity of evidence is found, it will make no difference that the form of the two actions is not the same."

Notwithstanding appellant's assertions to the contrary, it is clear that, with respect to any question as to monies due under the reserve account, that test has been satisfied, and, to that extent, the causes of action are the same. The evidence necessary to support Ziegler's set-off claim in the first action was precisely that necessary to support World Wide's claim pertaining to the reserve account in this action.[3]

This raises what appears to be a seeming conflict in the law, involving the relationship among three different principles. First, it is clear, having been often repeated by the Court of Appeals, that, where direct estoppel applies, the first judgment bars a party from subsequently raising not only matters that were, in fact, decided in the first action, but also those "which could have been decided in that case." *See MPC, Inc. v. Kenny, supra,* 279 Md. 29; *Sterling v. Local 438, Etc.,* 207 Md. 132 (1955), *cert. den.,* 350 U. S. 875 (1955). Certainly, the claim that the Bank had breached the Dealer's Agreement by refusing to purchase notes could have been raised in the form of a counterclaim in the first action, although it was not *required* to be so raised in that action. Maryland Rule 314a. provides, in relevant part:

"In any action any party, against whom a claim, counterclaim, cross-claim or third-party claim has been asserted, may plead as a counterclaim any claim he has against any opposing party.

"The counterclaimant *may* claim relief exceeding in amount or different in kind from that sought in the pleading of the opposite party, and need not diminish

---

3. For the reasons stated by the Court in MPC, Inc. v. Kenny, *supra,* we do not consider the fact that the set-off claim was raised in the first action by Ziegler rather than by the defaulting World Wide, given the relationship of the two defendants, to prevent the application of direct estoppel on the premise that the parties to the two actions were not the same.

or defeat the recovery sought by the opposing party." (Emphasis supplied.)

Had appellant raised this issue in the first action, as a counterclaim, the evidence necessary to support it in that form would have been the same as that necessary to support it in this action. Thus, on the one hand, it appears that, because there is the sameness of actions regarding the reserve account and because this issue *could have been* raised, it too is precluded by direct estoppel.

It has been generally, if not universally, recognized, however, that this aspect of direct estoppel does not apply with respect to a counterclaim arising from an independent cause of action not raised *and not required to be raised* in defense of the earlier action. A succinct statement of this principle was provided in 8 A.L.R. 694, 695 (Anno. — *Failure to Assert Claim by Set-Off, Etc.*):

> "The general rule is that a defendant, having a claim available by way of set-off, counterclaim, or cross petition, has an election so to plead it, or to reserve it for a future independent action, and a prior action in which a claim might have been asserted as a set-off, counterclaim, or cross petition is no bar to a subsequent independent action thereon."

*See also* Restatement of the Law of Judgments, § 58, p. 230:

> "Where the defendant does not interpose a counterclaim although he is entitled to do so, he is not precluded thereby from subsequently maintaining an action against the plaintiff on a cause of action which could have been set up as a counterclaim."

Another expression of the rule, indicating more clearly the rationale behind it, is found in 2 Freeman on Judgments, § 786 (5th Ed.), pp. 1665-66:

> "It has already been noticed that while a defendant must bring forward all purely defensive matter, he is not barred by a former judgment

against him as to any matter which he was not bound to present and which was not in fact litigated. A judgment is not conclusive of those matters as to which a party had the option to but did not in fact put in litigation in the action. The statutes of set-off and counterclaim are for the benefit of defendants, and plaintiffs cannot compel defendants to avail themselves of those benefits. Everyone should have the right to try his own case in his own way. It may require time for the development and discovery of the nature and extent of the damage arising from a cross-demand, and a rule requiring him to litigate it at the option of his adversary might deprive him of the value of it. The general rule, therefore, in the absence of a contrary statute, is that a defendant having an independent claim available as a cross-demand, whether in contract or tort, has the option either to plead it as such or to reserve it for a future independent action, and in the latter event the former judgment will not operate as a bar or estoppel." (footnotes omitted.)

*See,* as well, 50 C.J.S. *Judgments,* § 684b. (3), p. 136.

This principle, as expressed in these treatises, has been followed by courts throughout the country, apparently without exception.[4] The Maryland Court of Appeals, without stating the rule quite so directly as these other courts, nevertheless gave recognition to it in *Davidson Chem. Co. v. Miller Co.,* 122 Md. 134 (1913); *c.f. Impervious Products Co. v. Gray,* 127 Md. 64 (1915). We concluded in *Singer v. Steven Kokes, Inc., supra,* 39 Md. App. at 182-83, that "[i]f a matter is not in the nature of a defense but constitutes a

---

4. *See,* by way of example, Frank M. Herbert, Inc. v. M & P Scrap Iron & M. Corp., 247 N.Y.S.2d 193, 197 (1964); Seager v. Foster, 169 N. W. 681 (Iowa, 1918); Meyer v. Vance, 406 P. 2d 996 (Okl., 1965); Leslie v. Brown Bros. Incorporation, 283 P. 936 (Cal., 1929); Buck v. Mueller, 351 P. 2d 61 (Ore., 1960); Graham v. Sisco, 449 S.W.2d 949 (Ark., 1970); Jackson v. Farmers Union Livestock Commission, 181 S.W.2d 211, 221 (Mo., 1944); Mechanical Devices Co. v. General Builders, 99 A. 2d 605 (N.J. Super., 1953), *rev. on other grounds,* 105 A. 2d 673; State v. Calhoun, 93 N.E.2d 317, 320 (Ohio, 1950); Stoner v. Stoner, 115 N.E.2d 103, 106 (Ill. App., 1953); Strunk v. Bennett, 258 S.W.2d 517 (Ky., 1953); Maramen v. Thompson, 243 So. 2d 34 (Ala., 1971).

counterclaim, the general rule is that the party is not required to assert the claim unless the subject matter is such an integral part of the issue being litigated that a judgment would necessarily negate the existence of facts essential to its maintenance."

This brings into play the third principle — that which disfavors the splitting of causes of action. In *Ex Parte Carlin,* 212 Md. 526 (1957), the Court stated, at pp. 532-33:

> "It is well established that a single cause of action or an entire claim cannot be split up or divided and separate suits maintained for the various parts thereof. A judgment or decree in a suit for a part only of a single cause of action or entire claim permits *res judicata* to be successfully relied on if the remainder is sued on later. The rule is intended to prevent multiplicity of litigation and to avoid the vexation, costs and expenses incident to more than one suit on the same cause of action. Its bases are the maxims 'that it is the interest of the State, there should be an end to litigation' and that 'no man should be twice sued for the same cause.' "

*See also Frontier Van Lines v. Md. B. & Tr. Co.,* 274 Md. 621 (1975); *Singer v. Steven Kokes, Inc., supra,* 39 Md. App. 180.

The question is whether this claim arising from the Bank's alleged failure to purchase notes which (1) is different from that based upon the reserve account but arises from the same agreement, and (2) could have been raised as a counterclaim in the first action but was not raised, is nevertheless barred because the failure to raise the issue earlier constitutes an improper splitting of actions. We think not.

The two claims by World Wide, though arising from or out of the same contract, are quite different. They rest on entirely different theories and, to succeed, would require proof of wholly different sets of facts. They are not, as was involved in *Carlin,* "a single cause of action" or "an entire claim". This also distinguishes this case from *Singer, supra,* which

involved a series of claims of the same type and based upon the same theories of law.

It thus becomes evident that appellant's claim for damages arising out of the Bank's alleged refusal to purchase notes in breach of the Dealer's Agreement is not precluded by application of direct (or collateral) estoppel. This claim is independent of the Bank's claim against appellant, and is also independent of World Wide's attempted set-off to it raised in the first action.

In summary, then, it appears that so much of Count I as is premised upon monies being owed to appellant from the reserve account is barred by both direct and collateral estoppel, and summary judgment was properly entered as to it. However, to the extent that there may be in Count I a well pleaded claim based upon the Bank's alleged refusal to purchase notes from appellant (a point we do not decide here), such a claim would not be barred by direct or collateral estoppel. As to that claim, therefore, the summary judgment, which rested solely upon the application of *res judicata,* was inappropriate and will, to that extent, be reversed.

> *Judgment affirmed in part, reversed in part, and remanded for further proceedings.*
> *Costs to be divided equally between the parties.*